UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Anthony Favors, | Case No. 20-cv-365 (SRN/DTS) |
| Plaintiff, | |
| v. | **ORDER &** <br> **REPORT AND RECOMMENDATION** |
| Kristi Mike, et al., | |
| Defendants. | |

*Pro se* plaintiff Joseph Favors is a civilly committed patient in the Minnesota Sex Offender Program (MSOP) at its St. Peter, Minnesota facility. Compl. 3, Dkt. No. 1. Favors asks this Court for a temporary restraining order (TRO) "requir[ing] Defendants to immediately ceas [sic] and desist any plans or actions to place [Favors] back in the same living unit, Core Group, Module, or bedroom with" specific MSOP clients. TRO Mot. 3, Dkt. No. 31. Favors contends that such an order would "keep [him] removed from the extreme risks of serious bodily injury, and incompatibilities instigated by" those other clients. TRO Mot. 3. Favors has not alleged any facts on which this Court can find that MSOP's decisions on Favors's living or group assignments would cause or threaten to cause him irreparable harm. Therefore, this Court recommends that Favors's motion for a TRO be denied.

**FINDINGS OF FACT**

Favors sued under 42 U.S.C. §§ 1983 & 1988 alleging multiple State of Minnesota MSOP employees violated several of his constitutional rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. Compl. 2. He is "asserting Claims for common-law *Harassment and Intimidation* and violation of the *First Amendment*, or alternatively, the *Fourteenth Amendment*." Compl. 2. Broadly, Favors

alleges MSOP employees have harassed him in retaliation for raising concerns that MSOP "refused and did not follow MSOP Police [sic]" in handling several of Favors's complaints. Compl. 4. Favors requests that this Court issue a TRO to prevent MSOP from housing Favors with specific MSOP clients, who, though not parties to this litigation, are integral to his allegations.

**I. Background**

Minnesota civilly committed Favors in November 2009 as a Sexually Psychopathic Personality (SPP) and Sexually Dangerous Person (SDP). Compl. 3–4. He is now treated at MSOP's Community Preparation Services (CPS) facility in St. Peter, Minnesota. Compl. 3. The events giving rise to this action began when Favors reported to MSOP staff a perceived improper relationship between two MSOP clients (J.G. and H.R.). *See* Compl. 4. Favors believed H.R. was "taking advantage of [J.G.,] a younger naïve and vulnerable" client "to exploit [J.G.] sexually and whatever other ways."[1] Compl. 4. Favors reported his concern to the CPS Director, Defendant Michelle Sexe, and also admitted his attraction to J.G. Compl. 4. Either because of Favors's attraction to J.G. or the distraction from H.R. and J.G.'s purported relationship, Favors requested to change living units "because it interrupted his treatment." Compl. 4.

---

[1] Favors describes H.R.'s exploitation of J.G. as a result of "*The Game,*" which he explains is "[a] sophisticated attack on the victims' belief system used by ghetto pimps to '*Turn Out*' usually European females to be prostitutes" and "refers to an individual's own verbal prowess abilities with a naïve, unsophisticated vulnerable person." Compl. 5. MSOP employees apparently refused to acknowledge that "The Game" existed and instead believed "Favors was the problem and delusional." Compl. 6. From MSOP's disbelief, Favors concludes that his reporting "The Game" to MSOP employees and then raising concerns that MSOP violated investigation policies led MSOP employees to "their, apparent, premature and biased immediate conclusion about ['The Game'] [which manifested as] animus towards Favors for filing a Complaint in CPS . . . and messed [Favors] up in his mind." Compl. 6.

2

Just two days after Favors reported his concerns, he concluded that MSOP had failed to follow its own policy by timely investigating his complaint, and filed a second complaint. Compl. 4-5. Despite Favors's conclusion that MSOP's investigation was untimely, the next day—now only three days after Favors's first complaint—MSOP employees invited Favors to discuss his complaints. Compl. 7. The tenor of the meeting left Favors "fe[eling] threatened that he would be sent back inside the secured perimeter if he chose to file a Complaint in CPS." Compl. 7. That said, "Favors later filed his Complaint to Defendant, Harpstead and Johnson describing all the threat from Sexe and what he reported and why." Compl. 7.

This cycle continued up the chain of command: Favors, believing that the MSOP employees who took his complaint had failed to properly investigate it and fearing retaliation, would then file another complaint at the next supervisory level. *See, e.g.*, Compl. 7–9. Favors's escalating complaints were not without repercussion. Staff confronted Favors about his fixation on reporting H.R. and J.G.'s improper relationship and his repeat complaints, and scheduled Favors for a "psych appointment." Compl. 9. Because Favors had just seen his mental health practitioner the week prior, Favors believed this new psychiatric appointment was a form of "adverse action" and retaliation. Compl. 9. MSOP also designated Defendant Kristi Mike as Favors's primary therapist, which Favors also viewed as retaliatory because it "was the fifth time [his] primary therapist had been changed in two months at CPS." Compl. 10.

Favors also alludes to other forms of retaliation by MSOP employees. For example, he alleges he once ordered Godfather's Pizza and an MSOP employee told Favors that Godfather's called to say Favors "*did not have funds to pay for it.*" Compl. 10. Yet when Favors called Godfather's, an employee confirmed that Favors's "order was paid for before the food was delivered. No problem." Compl. 10; *see* Compl. 11–12.

3

Favors describes MSOP staff as acting "to intimidate him, and harass him with undisputable malicious and evil, spiteful punishments only made possible through [MSOP's] authority under the color of law for which Favors is entitled to substantial compensation." Compl. 13.

## II. The TRO

Favors expounds upon these allegations and submits similar instances of retaliation by MSOP employees in his First, Second, and Third Amended Complaints.[2] *See* First Am. Compl., Dkt. No. 3; Second Am. Compl., Dkt. No. 6; Third Am. Compl., Dkt. No. 10. Though Favors pleads that "[t]his Case is **_NOT_** about [his] Complaints against other Peers" the relief he requests in the TRO relates directly to those peers. *See* TRO Mot. 3. Favors asks "the Court for a temporary restraining order to require Defendants to immediately ceas [sic] and desist any plans or actions to place [Favors] back in the same living unit, Core Group, Module, or bedroom with CPS Client JG, HR, or their best friend HC . . . to thereby keep [Favors] removed from the extreme risks of serious bodily injury, and incompatibilities instigated by these Clients with [Favors] that resulted in [Favors] being removed from the same living unit, Core Group, Modules, or bed room with these Clients on June 24, 2020." TRO Mot. 3–4.

Though Favors fails to describe the significant events of June 24, he alleges that "conflict and incompatibility" caused Defendants to move Favors to a different living unit. Pl.'s Mem. 6. Now, Favors asserts, Defendants plan to move him back to a living unit occupied by H.R. and J.G. as a form of retaliation against him. Pl.'s Mem. 6. He insists

---

[2] Though Favors has filed multiple amended complaints, Rule 15 allows him to "amend [his] pleading **once** as a matter of course," Fed. R. Civ. P. 15(a)(1) (emphasis added), after which he needs "the opposing party's written consent or the court's leave," Fed. R. Civ. P. 15(a)(2). Favors's repeat filing of amended complaints violates Rule 15 and the Court will strike all but the First amended Complaint, which is the operative pleading.

4

that any change in his living situation will "sabotage [his] treatment progress, and impose numerous punishments, and adverse action upon [him]." TRO Mot. 4. Favors claims, any "plan to move [H.R. and J.G.] back into the same environments with [him]" is simply a means for MSOP to "use the conflicts [MSOP staff] instigate . . . to impose more continuing adverse action on [Favors] to thereby retaliate against [him], which is the entire subject of this lawsuit against Defendants." TRO Mot. 4. Put simply, Favors believes that MSOP's residential changes are intended to cause discord between Favors and other MSOP clients, which will cause Favors to act in a way that results in adverse action. MSOP's residential changes are thus the cause of any adverse action and are retaliatory.

In the memorandum supporting his motion for a TRO, Favors asserts that his lawsuit—the main § 1983 action—alleges Defendants' conduct caused a "[s]*ubstantial risk of serious irreparable physical and psychological harm or death*" by placing Favors "in the same living unit, Core Groups, Modules, or sleeping quarters with JG, HR, or HC." Pl.'s Mem. 4 ¶ 2, Dkt. No. 32. Favors further alleges placing him and the other clients in a shared location is "Unconstitutional and void, being in contravention of the United State [sic] Constitution's First, Eighth and Fourteenth Amendment ban on deprivation of '*life, liberty, or property*.'" Pl.'s Mem. 4 ¶ 3.

## CONCLUSIONS OF LAW

Federal courts may issue an *ex parte* TRO only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1). Likewise, courts "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Though slight, the distinction rests on notice to the adverse party. Favors requests that the Court issue a TRO, but since Defendants have responded it is clear that they have had notice. Defs.' Mem., Dkt. No. 43. Because

5

Courts apply the same legal standard for issuing a TRO or a preliminary injunction, *Izabella HMC-MF, LLC v. Radisson Hotels Int'l, Inc.*, 378 F. Supp. 3d 775, 777–78 & n.2 (D. Minn. 2019), and because the facts now align more with a preliminary injunction, the Court construes Favors's motion for a TRO as seeking a preliminary injunction. *See Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1052 n.1 (D. Minn. 2013) (construing ambiguous TRO/preliminary injunction motion as one for a preliminary injunction because defendant had notice and filed opposition brief).

I. **Legal Standard**

Courts assess four factors when determining whether to issue a preliminary injunction:

(1) the likelihood of the movant's success on the merits;

(2) the threat of irreparable harm to the movant in the absence of relief;

(3) the balance between that harm and the harm that the relief would cause to the other litigants; and

(4) the public interest

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors— irreparable harm, balance of harms, and the public interest—weigh in the [moving] party's favor." *McMahon v. Delta Air Lines, Inc.*, 830 F. Supp. 2d 674, 688 (D. Minn. 2011). Though the 'success on the merits' factor does not require the moving party to prove their probability of prevailing is more likely than not, *Dataphase*, 640 F.2d at 113, the movant

6

must show a "fair chance of prevailing" on the merits, *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

Even if success on the merits is likely, however, "preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). In the preliminary injunction context, a party establishes irreparable harm by showing "that a cognizable danger—more than a 'mere possibility'—exists of a future violation." *C.H. v. Sullivan*, 718 F. Supp. 726, 730 (D. Minn. 1989). The moving "party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

Above all, courts must consider that "preliminary injunction[s] [are] an extraordinary remedy," *Watkins, Inc.*, 346 F.3d at 844, issued only "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits," *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (*per curiam*). The extraordinary nature of a preliminary injunction is especially significant in "the prison context, [where] a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1241 (8th Cir. 1982)). Though civilly committed sex offenders—like Favors—are not prisoners, "[t]hese same concerns are present where the administration of a facility housing civilly committed sex offenders is concerned. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 887 (8th Cir. 2006) (explaining that 'federal courts are to give deference to state officials managing a secure facility, and [Minnesota Sex] Offender Program staff have a substantial interest in providing efficient procedures

7

to address security issues')." *Benson v. Piper*, No. 17-cv-266 (DFW/TNL), 2017 WL 4221105, at *2 (D. Minn. July 31, 2017), *report and recommendation adopted*, 2017 WL 4220446 (D. Minn. Sept. 21, 2017). "[T]he burden of establishing the propriety of an injunction is on the movant." *Watkins, Inc.*, 346 F.3d at 844.

## II. Analysis

Nothing in Favors's First Amended Complaint or the record before the Court supports a conclusion that Favors faces an imminent threat to his health or safety such that there is a clear and present need for extraordinary equitable relief. Beyond his conclusory allegations that he faces a "[s]ubstantial risk of serious irreparable physical and psychological harm or death" by being co-located with H.R. or J.G., Favors alleges no facts to support his request. Favors's mere incantation of key phrases—like "[t]here can be no dispute that the threat of irreparable harm is imminent and real. [Favors] should not be put at extreme risk of physical or psychological harms from Defendants," is insufficient to justify the remedy he seeks. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction."). Favors's claim of irreparable harm is that because he filed grievances against H.R. and J.G. there is an incompatibility between them, which in turn will cause (undefined) irreparable harm if he is housed with them. This allegation is insufficient to justify a preliminary injunction. *See Aune v. Ludeman*, No. 09-cv-15 (JNE/SRN), 2009 WL 1586739, at *4–5 (D. Minn. June 3, 2009) (finding plaintiff's claim that sharing room with MSOP client adversely affected his "health, treatment, comfort, safety and well-being" was too speculative and did not meet burden for injunctive relief). Favors also asserts that maybe "the AG's office may request [Favors] to testify against [H.R. or J.G., which] would not be appropriate," thus creating a conflict of interest. Pl.'s Mem. 11. There are

8

simply too many "maybes," "what-ifs," or "coulds" in Favors's reasoning to establish a concrete threat of irreparable harm.

Because "preliminary injunctive relief is improper absent a showing of a threat of irreparable harm," *Roudachevski*, 648 F.3d at 706, Favors's motion must be denied.

## ORDER

For these reasons, IT IS HEREBY ORDERED: these documents are **STRICKEN**:

1. Second Amended Complaint, April 6, 2020, Docket No. 6; and

2. Third Amended Complaint, April 29, 2020, Docket No. 10.

## RECOMMENDATION

For these reasons, IT IS HEREBY RECOMMENDED that Plaintiff Joseph Anthony Favors's motion for a temporary restraining order (Docket No. 31) be **DENIED**.

Dated: November 17, 2020               \_\_s/David T. Schultz_____
                                       DAVID T. SCHULTZ
                                       United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to the magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

9